U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 OCT 17 PM 4: 42

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 5:11-cr-94 |
| ) | |
| MICHAEL NORRIE ) | |

**OPINION AND ORDER RE: COMPETENCY**
(Doc. 36)

This matter came before the court on September 11, 2012 for an evidentiary hearing on the Government's motion for a determination of mental competency of Defendant Michael Norrie pursuant to 18 U.S.C. § 4241 (Doc. 36.) Defendant did not oppose that motion and has, himself, raised issues with regard to his competency, most notably in a pending motion to suppress. The Government called William J. Ryan, Ph.D., as its sole witness. Defendant called Mary Willmuth, Ph.D., as his sole witness.

Defendant is charged with being an unlawful user of controlled substances while knowingly possessing a firearm that had been shipped or transported in interstate commerce in violation of 18 U.S.C. § 922(g)(3) and with knowingly possessing a stolen firearm that had shipped or transported in interstate commerce in violation of 18 U.S.C. § 922(j).

The Government is represented by Assistant U.S. Attorney Joseph R. Perella. Defendant is represented by David V. Kirby, Esq.

I. **Expert Witness Opinions and Findings of Fact.**

   A. **Dr. Ryan's Conclusions and Opinions.**

As directed by court order dated June 18, 2012, Dr. Ryan performed a psychological examination of Defendant and filed a report with the court pursuant to 18 U.S.C. § 4241(b) (the "Ryan Report"). The Ryan Report contains the information required by 18 U.S.C. § 4247(c). Without objection, the Ryan Report was admitted into

evidence as Exhibit 2 and Dr. Ryan testified to the conclusions he reached therein.

Dr. Ryan's curriculum vitae was admitted into evidence as Exhibit 1. In brief, Dr. Ryan has a Bachelor of Science degree in Nursing from the University of Buffalo and a Master of Arts and Doctorate in Clinical and School Psychology from Hofstra University. From October 1993 to May 1995, Dr. Ryan was employed as a staff psychologist by the Federal Bureau of Prisons. In May of 1995, he was promoted to forensic psychologist and has been employed in that position for approximately seventeen years. As a forensic psychologist, he evaluates criminal defendants based upon court orders for competency to stand trial and less typically for criminal responsibility, insanity, diminished capacity, and sentencing issues. From approximately 1995 to the present, he has performed sixty to seventy-five competency to stand trial evaluations per year. In approximately one third of the cases, he has found a defendant not competent to stand trial. He has testified on behalf of the prosecution and the defense "[p]robably almost equally." (Tr. 9/11/12 at 7). Dr. Ryan is a licensed psychologist and certified school psychologist and from 1999 to the present, he has been a Clinical Assistant Professor of Psychiatry and Behavioral Sciences at New York Medical College, St. Vincent's Hospital where he has trained Psychiatry residents. Defendant does not challenge Dr. Ryan's qualifications to offer an expert opinion as to Defendant's competence to stand trial and the court has found him qualified to render this opinion.

In July 2012, Dr. Ryan conducted a competency evaluation of Defendant over six different dates resulting in approximately seven total hours of examination. The evaluation consisted of four components: (1) interviews with collateral informants such as the prosecution and defense counsel; (2) review of documents regarding the Defendant; (3) testing; and (4) interviewing the Defendant regarding his psychosocial history and his legal understanding of the components of a trial, the roles of various participants, and his own rights. Dr. Ryan did not conduct his own intelligence test of Defendant, but instead relied on those previously conducted which yielded consistent results of mild mental

retardation.

At the time of Dr. Ryan's evaluation, Defendant was incarcerated in a typical housing unit, was reported to be cooperative with no disciplinary problems, and was able to manage his own personal care needs. During his incarceration, he has been assessed by a staff physician who diagnosed Defendant with Anxiety State, Unspecified, and Depressive Disorder, Not Otherwise Specified. He was prescribed Hydroxyine Pamoate (antianxiety agent) and Sertaline (antidepressant) for these conditions.

Dr. Ryan described Defendant as a twenty-two year old single, white male born and raised in St. Johnsbury, Vermont. Defendant is the father of a daughter, age four, and a daughter, age two, who have different mothers. Defendant was living with his youngest daughter, her mother, and her mother's father prior to his most recent incarceration. He expressed to Dr. Ryan that he cannot take care of himself.

Defendant described to Dr. Ryan a challenging early childhood in his mother's care which included homelessness, a variety of temporary residences and caregivers, and exposure to his mother's physically and verbally abusive boyfriends. In addition, Defendant reported that he was sexually abused by two individuals. Defendant reported ongoing mental preoccupation and nightmares regarding this abuse.

When Defendant was approximately thirteen, he began living with his father and his stepmother which provided him with a more stable living environment and family relations. Defendant described this aspect of his childhood as "awesome." Exhibit 2 at 3.

Defendant periodically attended public schools in Vermont where he was placed in Special Education classes with an Individual Education Program. He was able to describe his educational experiences to Dr. Ryan consistent with a report dated March 19, 2012 prepared by his expert witness (the "Willmuth Report"). Dr. Ryan relied upon the Willmuth Report in formulating some of his conclusions. In particular, he agreed with the Willmuth Report that testing of Defendant's intellectual functioning has consistently

revealed Defendant to be in the Mildly Mentally Retarded Range.[1] He also noted Defendant has been diagnosed as having Attention Deficit Disorder and that an October 2004 evaluation performed by Paul Donahu, Ph.D. found Defendant learning impaired with increasing behavioral difficulties. Dr. Ryan did not personally observe symptoms of Attention Deficit Disorder and has never found a criminal defendant who suffered from this condition alone incompetent to stand trial. He acknowledged that other diagnosticians had concluded that Defendant suffers from attention deficits.

Dr. Ryan agreed with the Willmuth Report's conclusion that Defendant had an extensive history of drug abuse. He also agreed that Defendant's use of inhalants would be a contributing factor to deficits in Defendant's mental cognitive functioning. Although Defendant reported that he had never been treated by a psychiatrist, psychologist, or a counselor, he reported receiving Ritalin and mental health treatment as a child. He also reported a long history of depression, including one suicide attempt. Defendant's medical history and condition was notable for high blood pressure and several head injuries including a dog bite on the head as a child; a 2003 accident in which he was hit in the head by a lawnmower and suffered loss of consciousness, a concussion, and a self-reported broken collarbone; a 2008 incident in which he tripped on his shoes and fell down a staircase; and a 2009 incident in which he was hit in the face with a baseball bat and reportedly lost consciousness. Defendant reported experiencing memory difficulties after the lawnmower incident. He generally recited his medical history accurately although he was imprecise regarding dates. Dr. Ryan opined that Defendant's past head injuries likely contribute to his cognitive impairments.

Dr. Ryan's testing of Defendant included a Personality Assessment Inventory which was deemed invalid. Other tests demonstrated Defendant's low engagement with

---

[1] Dr. Ryan relied in part on Dr. Willmuth's intelligence testing of Defendant revealing scores on a variety of tests ranging between "69 and 55 [which] fall in the mildly mentally retarded range." Exhibit B at 8.

4

the testing process. Dr. Ryan concluded that there were sufficient valid results to opine that "Mr. Norrie seems to be suffering from situational stress, which is more demanding than his adaptive capabilities are accustomed to, and he is consequently vulnerable to becoming upset, anxious, and disorganized." Exhibit 2 at 11. "He is less capable than most people of dealing effectively with everyday experience, especially with respect to social situations, and he has difficulty managing interpersonal relationships. There are indications of resistance, likely to be associated with underlying feelings of anger and resentment toward people and toward the world in general." *Id.* (citation omitted). Dr. Ryan administered the Rey 15-Item Test, a test of malingering memory deficit, and as Defendant could remember ten out of fifteen items, he concluded that Defendant was not attempting to malinger his memory deficits.

In the course of the evaluation process, Defendant reported atypical hallucinations for individuals with a psychotic disorder (such as talking to his shoes) which ceased during the course of the evaluation process. He showed no signs of expressive or receptive speech difficulties and his speech was logical, coherent, and relevant. He was fully oriented to time, place, person, and circumstances. Dr. Ryan nonetheless found Defendant's "insight and judgment are quite poor." Exhibit 2 at 12.

Dr. Ryan's diagnosis of Defendant's "Mental Disease or Defect:" included Mild Mental Retardation, Major Depressive Disorder, Recurrent, Severe with Psychotic Features, and Posttraumatic Stress Disorder. Exhibit 2 at 18. He further observed that Defendant appeared to exhibit Polysubstance Dependence, and that he could not rule out a Cognitive Disorder, Not Otherwise Specified. Dr. Ryan opined that Defendant's depression and anxiety during testing impaired his initial performance during testing. As the evaluation progressed, Defendant's symptoms in this regard diminished and his performance improved. Dr. Ryan thus opined that Defendant's current psychiatric medication regime should be maintained in order to enhance Defendant's ability to retain competence.

Dr. Ryan noted that Defendant has four previous criminal charges: 6/18/08 (Marijuana Possession, Vehicle Operation -- Careless or Negligent Vehicle Operation-Attempt to Elude Officer); 3/30/09 (Grand Larceny, Violations of Conditions of Release); 10/6/09 (False Information); and 10/11/11 (Possession of Weapon). There is no evidence regarding whether Defendant was convicted of these charges or whether he has ever previously been evaluated for competency to stand trial.

With regard to Defendant's competence to stand trial, Dr. Ryan found that Defendant was able to state the charges against him and the possible sentence but initially exhibited difficulty with definition of courtroom terms and the roles of the various participants. During the initial interview, it appeared that Defendant's understanding of "the adversarial nature of the courtroom proceedings was complicated by his memory and comprehension difficulties." Exhibit 2 at 15-16. As the evaluation progressed over succeeding dates, Defendant's comprehension improved and he was able to retain information that was provided to him. Dr. Ryan attributed this, in part, to Defendant's medication.

Based upon the foregoing, to a reasonable degree of psychological certainty, Dr. Ryan summarized his opinion as follows:

> Despite his limitations, Mr. Norrie is not experiencing any symptoms that would interfere with his ability to understand the nature of his charges, courtroom proceedings, or his ability to consult with his attorney. Mr. Norrie is currently experiencing hallucinations, however, after multiple interviews with Mr. Norrie this evaluator believes his psychotic symptoms would not impair his ability to form a trusting, consultative relationship with his attorney. Mr. Norrie is not currently experiencing any delusions or other serious psychiatric symptoms that would impair his ability to form a trusting, consultative relationship with his attorney. He is currently capable of maintaining proper courtroom behavior, as well as appropriately attending to and participating in courtroom proceedings.
>
> Mr. Norrie is fully oriented and in good contact with reality. He is

> capable of comprehending the seriousness of his case and the recommendations of defense counsel. He is capable of communicating with counsel, weighing the merits of various defenses, and making decisions regarding numerous constitutional protections such as his right to trial, his right to an attorney, his right to enter into a plea, and his right to call witness[es], etc. He is capable of testifying in his own defense and speaking during sentencing proceedings should it be necessary.
>
> It is the opinion of this evaluator Mr. Norrie has a rational and factual understanding of the proceedings against him and he is capable of assisting counsel with his defense. It is, therefore, the opinion of this evaluator Mr. Norrie is Competent to Stand Trial.

Exhibit 2 at 17. In addition to maintaining Defendant's medications, Dr. Ryan provided recommendations regarding how Defendant's comprehension of courtroom proceedings could be enhanced, including the following:

> Mr. Norrie suffers from a Mental Defect that limits his verbal comprehension and expression. To increase the probability [that] Mr. Norrie understands courtroom proceedings, an individual speaking to [Mr. Norrie] should speak slowly, clearly use vocabulary he understands, and make sure to define new terms. In an effort to obtain information from Mr. Norrie, one should provide examples of what information is requested, ask "what" or "where" questions, and paraphrase his response to help clarify meanings. Asking open ended questions and avoiding "yes" or "no" questions will help ensure Mr. Norrie understands what is going on. Additionally, Mr. Norrie will need support and encouragement from his lawyers to increase his self-efficacy and reduce his self-doubt.

Exhibit 2 at 17.

### B.   Dr. Willmuth's Conclusions and Opinions.

Dr. Willmuth's curriculum vitae was not presented to the court. She has been performing forensic evaluations for the past twenty-five years. She received her undergraduate training in Great Britain and received her Doctorate degree from the University of Vermont ("UVM"). She is a Clinical Associate Professor in UVM's Department of Psychology and is a founding member of the Board of Rehabilitation

7

Psychology which provides certification for professionals who evaluate individuals with physical and cognitive disabilities.

Dr. Willmuth has performed approximately ten evaluations for federal court cases, five of which involved competency evaluations. She has testified as an expert in federal court three or four times and testifies in state court approximately twice a year on the issue of competency. She has never testified as a court appointed expert on the issue of competency. She has evaluated one person with mental retardation for competency. All of her forensic work has been for defense counsel.

The Government did not challenge Dr. Willmuth's qualifications to testify as an expert witness in this matter and the court found that she was so qualified.

Dr. Willmuth's Report was admitted into evidence as Defendant's Exhibit B and was authored for the purpose of evaluating Defendant's responses to police interrogation. In conjunction with her report, she reviewed Defendant's educational and medical records and spent a full day evaluating and testing him at the jail at which he was incarcerated. She conferred with Defendant during the course of the court's competency hearing and determined that Defendant did not understand all of Dr. Ryan's testimony and appeared at times distracted.

In the course of her evaluation of Defendant with regard to other issues, Dr. Willmuth testified that she formed an opinion as to whether Defendant is competent to stand trial and effectively assist his attorney during his trial. She expressed her opinion as follows: "My concern, and I think that was the one that the Court picked up which, which sort of took us down this road, is around his ability to understand what is going on in the courtroom and the degree to which that may affect his ability to participate in his own defense and aid counsel in his own defense." (Tr. 9/11/12 at 66). She noted that she does not "have questions other than that regarding his competence, but that's a big other than that." *Id.*

Dr. Willmuth agreed that Defendant understood the charges, the lawyers' roles,

what a plea was, and the difference between a plea and a jury trial. She also agrees with Dr. Ryan's conclusions regarding Defendant's competency, but disagrees that the accommodations he suggests for Defendant would be sufficient in a trial setting. She observes that while Defendant's intellectual functioning is in the mild mentally retarded range, which would not alone render Defendant incompetent, because he is also "severely verbally learning impaired . . . particularly with regard to his ability to process language, to understand language and to understand what he is hearing and what is being said" (Tr. 9/11/12 at 67-8) and also suffers from head traumas and attention deficit disorders, she concludes that he is not competent to participate in a trial setting.

As for Dr. Ryan's suggestions regarding how Defendant's comprehension of courtroom proceedings may be enhanced, Dr. Willmuth concludes that they are not realistic expectations in a trial setting because neither a court nor a defense attorney could be expected to provide that level of accommodation. Dr. Willmuth did not rule out the possibility that adequate accommodations may exist.

### C. The Court's Findings of Fact.

The court finds the opinions of both experts persuasive and reliable but accords greater weight to those of Dr. Ryan based upon his more substantial experience in performing competency evaluations and his ability to observe Defendant over the course of six days which allowed him to determine whether Defendant could adequately retain information. Both expert witnesses agree that Defendant is generally competent to stand trial, however they differ regarding whether reasonable accommodations will permit Defendant to maintain competence in the rigors of a trial setting.

## II. Conclusions of Law and Analysis.

"In the absence of any indications to the contrary, a defendant charged with criminal behavior is presumed to be mentally competent to stand trial." *Brown v. Warden, Great Meadow Corr. Facility*, 682 F.2d 348, 349 (2d Cir. 1982). However, a criminal defendant who is not competent may not be tried for any crime as "the criminal

9

trial of an incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (citing *Medina v. California*, 505 U.S. 437, 453 (1992)). As the Supreme Court has explained, "[c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so." *Id.* (citing *Riggins v. Nevada*, 504 U.S. 127, 139-40 (1992) (concurring opinion)).

At the competency hearing, the court observed that the parties and the court shared a common interest in ensuring that Defendant was competent to stand trial. "However, once a defendant's competency has been called into question, either by the defendant or the prosecution expressly raising the issue, or through the presence of 'warning signals' which cause the court to raise the question sua sponte, the burden is placed on the prosecution to prove that the defendant is mentally competent to stand trial." *Brown*, 682 F.2d at 349; *see also United States v. Hollis*, 569 F.2d 199, 205 (3d Cir. 1977) (ruling "no burden of proof rests on defendant to demonstrate his own incompetency"); *United States v. Makris*, 535 F.2d 899, 906 (5th Cir. 1976) ("There can be no question that in federal criminal cases the government has the burden of proving defendant competent to stand trial"). "The federal courts that have considered the issue have been consistent in holding that mental competency to stand trial need be proved only by a preponderance of the evidence." *Brown*, 682 F.2d at 351 (citations omitted).

Based upon the preponderance of the evidence, the court must determine whether Defendant suffers from a "mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense[.]" 18 U.S.C. § 4241(d). In order to be competent to stand trial, a criminal defendant must have the "capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense[.]" *Drope v. Missouri*, 420 U.S. 162, 171 (1975).

In other words, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and must have a "rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). Accordingly, it is "not enough for the district judge to find that the defendant is oriented to time and place and has some recollection of the events." *Id.* (internal quotations omitted).

Defendant suffers from mild mental retardation which is a recognized mental defect that may affect competency. In addition, he suffers from learning disabilities and a history of head traumas as well as depression and anxiety with the latter conditions being alleviated in part through medications. The Supreme Court has identified certain challenges to competency in the case of defendants who suffer from mental retardation:

> [C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that become manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Atkins v. Virginia*, 536 U.S. 304, 318 (2002) (internal citations omitted). Consistent with these observations, some courts have found mentally retarded defendants competent to stand trial, while others have concluded that a particular degree of mental retardation or constellation of cognitive impairments render a defendant not competent. *Compare United States v. Rodriguez-Leon*, 402 F.3d 17, 23 (1st Cir. 2005) (finding defendant

competent to stand trial although defendant had "an IQ of 62, within the range of mild mental retardation, and . . . suffers from brain dysfunction, which affects in particular his memory and ability to process language"); and *United States v. DeCoteau*, 648 F. Supp. 2d 1145, 1149 (D.N.D. 2009) (holding defendant with mild mental retardation competent to stand trial despite his "very significant cognitive deficits") *with United States v. Rodriguez*, 2009 WL 2929808, at *5 (E.D. Pa. Sept. 8, 2009) (finding defendant with full-scale IQ of 69 not competent to stand trial due to congenital condition and later head trauma); and *United States v. Thompson*, 2007 WL 2480066, at *5 (M.D. Fla. Aug. 28, 2007) (holding that a defendant who was found to be malingering but who "likely has an IQ below 60, which is categorized as mild to moderate mental retardation" is not competent to stand trial and "'treatment' to restore competency is not an option.").

In evaluating the competence to stand trial of a criminal defendant who suffers from mental retardation, some courts rely upon expert testing using an assessment tool known as the Competence Assessment for Standing Trial for Defendants with Mental Retardation ("CAST*MR"). As one court described it, "[t]he CAST*MR is unique with regard to standardized competency assessment instruments in that it is designed specifically to assess individuals who have varying degrees of cognitive impairment." *DeCoteau*, 648 F. Supp. 2d at 1147; *see also Rodriguez*, 2009 WL 2929808, at *1 (using CAST*MR as basis of determination that defendant's "'profile is consistent with mentally retarded [defendants] who are not competent to proceed to trial'"). In this case, neither expert discussed the CAST*MR or apparently used it to evaluate Defendant. The court thus does not have the benefit of an expert opinion regarding the reliability of this assessment tool and whether it may yield useful information regarding Defendant's competency in this case.

Here, however, the issue appears to be less whether Defendant is generally competent to stand trial, on that point both experts agree that he is, but whether he will be able to maintain competence in a trial setting. In particular, both experts recognize that in

addition to mild mental retardation, Defendant suffers from certain learning disabilities and mental conditions that interfere with his ability to process information. As a result, although he is able to understand the charges against him and consult with his attorney, there is no assurance that in the more rapid pace and increased stress of a trial, he will retain his ability to process information with sufficient speed, comprehension, and lack of distraction to maintain competence.

At this juncture, the examination of trial accommodations has been relatively cursory. Dr. Ryan proposed ways in which the court and defense counsel may enhance Defendant's understanding of the proceedings, but he proffers no additional suggestions for witnesses who cannot be expected to alter their trial testimony to conform to the preferred method for presenting information to Defendant. Dr. Willmuth, while discounting Dr. Ryan's suggestions, offered few suggestions of her own and appeared to presume that trial accommodations would by necessity be limited and insufficient. In particular, the court notes that neither expert has opined regarding the efficacy of shorter trial days, breaks prior to the conclusion of direct examination and cross-examination so that defense counsel may consult with Defendant, or the use of a cognitive facilitator attuned to Defendant's particular challenges.

The charges against Defendant do not suggest that the Government's presentation of evidence at trial will be particularly complex, document dependent, or will necessitate multiple witnesses. However, presently there are no facts before the court upon which to base that conclusion.

Defendant appears to have had previous experience with the criminal justice system and thus may have a basis of knowledge and experience that has not yet been explored by the parties or their experts. In particular, the court is not aware of whether Defendant's competency was evaluated in conjunction with previous criminal proceedings and the outcome of those evaluations. Accordingly, although this case may involve a presentation of evidence at trial that will give rise to relatively easily

13

implemented accommodations that will allow Defendant to maintain competency in a trial setting, the facts before the court do not allow the court to reach that conclusion.

## CONCLUSION

Based upon the preponderance of the evidence, the Government has established that Defendant understands the nature of the charges against him, the roles of the participants in the criminal justice system, the purpose and nature of a plea and the difference between it and a trial, and that Defendant understands his constitutional rights. The Government has also established that Defendant is able to direct his attorney as to his wishes, consider his attorney's advice, and evaluate possible courses of action. Defendant thus has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him. The Government has not, however, established that Defendant will be able to maintain this competence in a trial setting. The court thus conditionally finds Defendant competent to stand trial, and will revisit the issue of both competence and accommodations as this matter approaches trial.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 17th day October, 2012.

Christina Reiss, Chief Judge
United States District Court